## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA EX REL., | ) |
| ALBERT YOUNG P.A., TERESA DEDINA L.P.N., | ) |
| VIANKA CALDERON, AND | ) |
| D'ANDRE HOOKS-CZAPANSKY. | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) |
| **v.** | ) |
|  | ) |

14CV2793
JUDGE CASTILLO
MAG. JUDGE FINNEGAN

SUBURBAN HOME PHYSICIANS d/b/a DOCTOR
AT HOME, JERRY GUMILA, DIANA JOCELYN
GUMILA, NAIMISH PATEL, PRASHANT PATEL,
HOME LIFE HEALTHCARE CORP.,
MEDEX HOME HEALTHCARE INCORPORATED, )
MEDEX HOME SERVICES AGENCY, INC., )
NELSON K. HODOGBEY, PHYSICIANS )
PREFERRED HOME CARE INC., FELICIA HAYES, )
TOSHETA BROWN GREENFIELD, COMET HOME )
HEALTHCARE, INC., MIRANDA HOME )
HEALTHCARE, INC., VIVIAN NWAKAH, JESSICA )
NWAKAH, CHRISTOPHER THEOPHILUS )
a/k/a CHRISTOPHER NWAKAH, A & Z HOME )
HEALTH CARE, INC., FELIX I. OMOROGBE, )
PATRICIA OMOROGBE, BESTMED-CARE )
SERVICES, LTD., ADONIS, INC., AKPEVWE S. )
OLIDGE PRO VITA HOME CARE, LLC, )
ELMERSON VILLA, FELICITO SUGAY, MARIA )
ALFEREZ, CHRISTEEN ROSALES, RODEL )
BUGAYONG, GOVVAS HEALTH CARE )
SERVICES, INC., VALENTINE AKPATA AND )
GLORIA AKPATA, )
)
**Defendants.** )

# FILED

APR 1 7 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## COMPLAINT AT LAW

Relators, on behalf of the United States, complain of Defendants as follows:

## FEDERAL JURISDICTION AND VENUE

1

1.     This action arises under Federal Statutes 31 U.S.C. §3732 and 28 U.S.C. §1331. Pursuant to 31 U.S.C. §3730(e), there have been no statutorily relevant public disclosures of the "allegations or transactions" in this Complaint and each Relator qualifies as an "original source" of the allegations and transactions herein even if such public disclosure had been made.

2.     Venue is properly in the Northern District of Illinois pursuant to 31 U.S.C. §3732(a) in that one or more of the defendants can be found in, resides in, and transacts business in this this District.

## THE CASE

3.     Effective January 21, 2014, the Centers for Medicare and Medicaid Services imposed a six-month moratorium on enrolling new home health agencies in "three high-fraud" cities; *viz* Miami, Chicago, and Houston (Exhibit 1). This case is about the symbiotic and incestuous relationship that has developed in Cook County between certain home health agencies and the doctors that allow Medicare fraud to flourish.

## PARTIES

4.     The Relators are Albert Young P.A.; Teresa Dedina L.P.N.; Vianka Calderon; and D'Andre Hooks-Czapansky. They bring this action pursuant to 31 U.S.C. §3730(b)(1). All Relators are former employees of Defendant Suburban Home Physicians, LLC. All Relators are residents of Illinois.

5.     The Defendants are:

### A.     Defendant Suburban Home Physicians LLC d/b/a Doctor At Home (Defendant "Suburban Home Physicians")

Defendant Suburban Home Physicians is an Illinois Limited Liability Company that practices medicine under the assumed name "Doctor at Home." Defendant Suburban

Home Physicians has electronically interconnected offices located at 830 East Higgins, Suite 113A, Schaumburg, IL and in the Philippines where it employs staff to review the medical records of alleged homebound patients in Illinois. Defendant Suburban Home Physicians treats only Medicare patients and refuses to treat any patient covered by Medicaid or third-party insurance (*e.g.* Blue Cross). Accordingly, every patient herein referenced has received medical services paid for by Medicare.

### B. Defendant Jerry Gumila (Jerry):

Defendant Jerry, according to the records of the Illinois Secretary of State, is the sole member/manager of Defendant Suburban Home Physicians. Defendant Jerry has no medical degree of any kind and has no known medical background.

### C. Defendant Diana Jocelyn Gumila (Jocelyn):

Defendant Jocelyn is Defendant Jerry's spouse and is an RN licensed by the State of Illinois. Defendant Jocelyn, at all times relevant, runs the day-to-day operations of Defendant Suburban Home Physicians.

### D. Defendant Naimish Patel (Naimish):

Defendant Naimish is a *de facto* owner of Defendant Suburban Home Physicians. He has made employment decisions for Defendant Suburban Home Physicians. He has visited the offices of Defendant Suburban Home Physicians on an almost daily basis. He is an officer of Defendant Home Life Healthcare Corp (*see* par 4F *infra*).

### E. Defendant Prashant Patel (Prashant):

Defendant Prashant is also a *de facto* owner of Defendant Suburban Home Physicians. Defendant Prashant has directed Defendant Suburban Home Physicians' medical staff to refer the prescriptions they write, whenever possible, to the pharmacies

3

he owns or controls *viz* Shreeji Pharmacy, Inc. 2266 North Lincoln Ave., Chicago, IL 60614; Mona Kea Pharmacy, Inc. *inter alia* located at 4332 North Elston Ave., Chicago, IL 60641; Value Care Pharmacy Inc. also located at 4332 North Elston Ave., Chicago, IL 60641; and Life Source Pharmacy Inc., 11238 South Western, Chicago, IL 60643. He periodically changes the names/corporate identities of his pharmacies (*see* Exhibit 2) in the hope of avoiding Medicare and Medicaid audits--a common practice of many independent Chicago pharmacies. He controls Xpress Mobile Imaging Company which was incorporated in Illinois on May 21, 2013 and has offices adjacent to those of Defendants Suburban Home Physicians and Defendant Home Life Healthcare Corp. He is the other co-member/manager of Defendant Home Life Healthcare Corp. (*see* par 4F infra).

### F.      Home Life Healthcare Corp. Defendants (Defendant Home Life):

Defendant Home Life was incorporated in Illinois on December 28, 2008. It has offices at offices 890 East Higgins Road, Suite 157--adjacent to those of Defendant Suburban Home Physicians. Its officers of record are Defendants Naimish and Prashant. It refers patients to, and receives patient referrals from, Defendant Suburban Home Physicians.

### G.      Medex Defendants:

Defendants Medex Home Healthcare Incorporated; Medex Home Services Agency, Inc.; and Nelson Hodogbey are sometimes herein collectively referred to as Defendant Medex.   On September 22, 2006, Defendant Hodogbey incorporated Defendant Medex Home Healthcare in Illinois and, on September 25, 2006, acquired Medicare NPI number 1922109966.   On December 14, 2009, Defendant Hodogbey

registered Medex Home Healthcare to do business in Indiana and acquired a second Medicare NPI number--1205122710--for that same corporation. On March 14, 2013, the foregoing Indiana registration was revoked. On April 22, 2013, Defendant Hodogbey incorporated Defendant Medex Home Services in Illinois. All of the Medex corporations do business at a one-story building located at 8124 Cottage Grove, Chicago, IL.

**H.    Physicians Preferred Home Care Inc. Defendants (Physicians Preferred).**

Defendant Physicians Preferred was incorporated in Illinois on June 6, 2008. On September 26, 2008, it acquired Medicare NPI number 1255581203. Defendant Physicians Preferred has held itself out as minority-owned business (WBE) with seven employees and annual sales of $950,000.00. According to the Illinois Secretary of State, its officers are Felicia Hayes and Tosheta Brown Greenfield.

**I.    Comet/Miranda Defendants**:

Defendants Vivian Nwakah, Jessica Nwakah, and Christopher Theophilus a/k/a Christopher Nwakah, control two Illinois Home Health Agencies; Defendant Comet Home Healthcare, Inc. and Defendant Miranda Home Healthcare, Inc. Defendant Comet was incorporated in Illinois on August 2, 2007. Defendant Comet acquired Medicare NPI number 1447414826 on July 15, 2008. Defendant Miranda was incorporated in Illinois on August 15, 2011. Defendant Miranda acquired Medicare NPI number 1093059453 on November 23, 2012.

**J.    Bestmed/Adonis Defendant (Bestmed):**

Defendant Akpevwe Olidge, according to the Illinois Secretary of State, is president of and accordingly controls two Illinois Home Health Agencies; Bestmed-Care

5

Services Ltd. d/b/a Bestmed-Care Institute and Adonis Inc. Defendant Bestmed was incorporated in Illinois on January 21, 2010. Defendant Adonis was incorporated in Illinois on August 28, 2011.

**K.     A & Z Defendants (A & Z):**

Defendants Felix I. Omorogbe and Patricia Omorogbe control three Illinois Home Health Agencies:

    (i)      Defendant A & Z Home Health Care, Inc. d/b/a Empathy Home Health Inc.; d/b/a Midpoint Health Career Training Institute, Inc.; d/b/a A & Z Home Health Inc. incorporated in Illinois on August 30, 2006.

    (ii)     Dominion Home Health Care, Inc. incorporated in Illinois on August 12, 2009.

    (iii)    Midpoint Home Care incorporated in Illinois on April 27, 2010.

**L.     Govvas Defendants (Govvas):**

Defendants Valentine Akpata and Gloria Akpata first incorporated Defendant Govvas Health Care Services, Inc. in Illinois on April 29, 2009. Four months later, on August 28, 2009, they voluntarily dissolved Govvas. Five days later, on September 2, 2009, they again incorporated Govvas Health Care Services, Inc. in Illinois. On November 8, 2009, Defendant Govvas acquired Medicare NPI number 1174850465.

**M.     Pro Vita Defendants (Pro Vita):**

Pro Vita Home Care, LLC was organized on March 14, 2006. Its members are Defendants Elmerson Villa; Felicito Sugay; Maria Alferez; Christeen Rosales; and Rodel Bugayong. Defendant Maria Alferez is also the president of Lincoln Park Home Health Care, Inc. incorporated in Illinois on October 31, 2006, NPI number 1225182280 acquired March 5, 2008. Defendant Elmerson Villa is the president of Atrium Home

Health Care, Inc. incorporated in Illinois on June 8, 2010, NPI 1578871711 acquired September 22, 2010.

## HOME HEALTH SERVICES

6.     Illinois law defines "Home Health Services" "to include part time and intermittent nursing services and other therapeutic services such as physical therapy, occupational therapy, speech therapy, medical social services, or services provided by a home health aide." 210 ILCS 55/2.05; also *see* definition at 42 U.S.C. §1395x(m).

7.     In Illinois, Home Health Services are provided by licensed Home Health Agencies (defined at 210 ILCS 55/2.04; 55/3; also *see* 42 U.S.C. §1395x(o)).    There are approximately    1005    Home    Health    Agencies    so    licensed    in    Illinois    (see https://data.illinois.gov/Public-Health/IDPH-Home-Health-Agencies-Directory/h54t-6qsk?) and, as of 2012, 509 were licensed in Cook County (*see* Exhibit 1).

8.     Under Illinois Law, licensed Home Health Agencies require a prescription, written by a licensed physician or other authorized medical personnel, to provide Home Health Services to homebound patients  (210 ILCS 55/2.05).  However, when Medicare pays the bills, Home Health Agencies must comply with additional federally-mandated safeguards in order to receive Medicare payments.

9.     Medicare, as an absolute precondition to paying for Home Health Services, requires a face-to-face encounter between a medical professional and a homebound patient.  That face-to-face encounter must occur within a 120 day window--either 90 days before, or 30 days after--the start of Home Health Services (Medicare's 90/30 Day Rule). *See* Chapter 7, Medicare Benefit Policy Manual, section 30.5.1.1 (effective 1/1/11) at page 4 hereto attached as Exhibit 3.

That face-to-face encounter is customarily documented in and by Medicare Form CMS-485 (485 Form). *See* Exhibit 3.

### MEDICARE FORM 485—ITS FUNCTION AND REQUIREMENTS

10.     Form 485 (Exhibit 4) must *inter alia* list the date the patient was seen along with "a brief narrative composed by the certifying physician who describes how the patient's clinical condition as seen during that encounter supports the patient's homebound status and need for skilled services." *See* Exhibit 3, page 4.

11.     A physician is allowed to dictate the information to be included in Form 485 for subsequent transcription at the physician's office. However, a physician cannot verbally communicate the contents of Form 485 to a Home Health Agency. Most importantly, a Home Health Agency cannot prepare Form 485 for the physician to rubber stamp. *See* Exhibit 3, page 4. Yet, according its former employees, Defendant Suburban Home Physicians never fills out Forms 485 as required by law. Instead, over one hundred Home Health Agencies in Cook County draft their own Forms 485 and thereafter forward those forms to Defendant Suburban Home Physicians for signature.

12.     Form 485, prepared by medical personnel, must be kept "on file" in a Home Health Agency's records. Home Health Agencies bill Medicare using a CMS 1450 claim form (Exhibit 6) or an electronic analog thereof. In so doing, Home Health Agencies certify, as an absolute condition of payment, that all Forms 485 are in their files. *i.e.* all certifications and recertifications "required by Federal regulation are on file." Exhibit 3, page 2, at par. 3.

### COUNT I
### DEFENDANTS MEDEX, JOCELYN AND SURBURBAN HOME PHYSICIANS' FALSIFICATION AND BACKDATING OF FORM 485 FOR PATIENT ES

8

13.     On January 14, 2013, Defendant Medex began providing Home Health Services to patient ES without the requisite Form 485 on file/ in its files.

14.     As of February 14, 2013, Defendant Medex still did not have Form 485 in its file for patient ES and the 90/30 day time limit for having a Form 485 on file had expired.

15.     On or about June 13, 2013, Defendant Medex entered into an oral agreement and conspiracy with Defendant Suburban Home Physicians whereby:

> A.     Defendant Medex would--in violation of Medicare Rules--draft and send a backdated Form 485 to reflect that patient ES was certified for Home Health Services from 5/14/13 to 7/12/13 (redacted partial copy hereto attached as Exhibit 4).
>
> B.     Defendant Suburban Home Physicians would execute that backdated Form 485 without seeing the patient and return it to Defendant Medex.

16.     Later that same day, Defendant Suburban Home Physicians, in furtherance of the foregoing oral agreement and conspiracy, received Patient ES's backdated Form 485 from Defendant Medex; affixed a physician signature to that form without the requisite face-to-face encounter; and returned that falsified Form 485 to Defendant Medex. Defendant Jocelyn, in a June 13, 2013 email, authorized the execution of that backdated Form 485 in knowing violation of Medicare's 90/30 day Rule. *See* email at Exhibit 5.

17.     Defendant Medex, when it submitted its claims for patient ES to Medicare, knowingly presented false and fraudulent claims for payment or approval in violation of 31 USC §3729(a)(1)(A) by certifying that, as a condition of payment, the Form 485 for patient ES was on file when it was not. Medicare, on information and belief, paid Defendant Medex for the foregoing falsified claims.

18. Defendants Jocelyn and Defendant Suburban Home Physicians violated 31 USC §3729(a)(1)(B) by executing, or causing to be executed, a falsified Form 485 for patient ES, and, in so doing, knowingly made and caused to be made a false record or statement material to the false or fraudulent claims submitted by Defendant Medex for the Home Health Services it allegedly provided to patient ES.

19. Defendants Medex, Jocelyn, and Suburban Home Physicians violated 31 USC §3729(a)(1)(C) by conspiring to commit violations of 31 USC §3729(a)(1)(A),(B).

**WHEREFORE** Relators pray:

(A)     The subject Defendants pay an amount to the United States Government of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 plus a civil penalty equal to 3 times the amount of damages which the United States has sustained as a result of Defendants' conduct.

(B)     Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d);

(C)     Relators be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. §3730(d);

(D)     The United s and Relators be granted all such other relief as the Court deems just and proper.

**COUNT II**
**DEFENDANTS PHYSICIANS PREFERRED, JOCELYN, AND**
**SURBURBAN HOME PHYSICIANS FALSIFICATION AND BACKDATING**
**OF FORM 485 FOR PATIENT VG AND OTHERS**

20-29. Relators incorporate paragraphs 1-11 supra as paragraphs 20-29 of Count II.

30. In or about Mid-2012, Defendant Physicians Preferred learned of a potential Medicare review/audit of its home health records. At that time, Defendant Physicians Preferred knew that it had previously submitted, as a condition of payment, certified claims specifically stating that it had the requisite Forms 485 on file as required by Medicare when it did not.

31.     Shortly after learning about that potential review/audit, Defendant Physicians Preferred entered into an oral agreement and conspiracy with Defendant Suburban Home Physicians whereby:

        A.     Defendant Physicians Preferred would--in violation of Medicare Rules--draft and send in excess of 100 backdated Forms 485 to Defendant Suburban Home Physicians.

        B.     Defendant Suburban Home Physicians would execute those backdated Forms 485 without seeing the patient and return them to Defendant Physicians Preferred.

32.     Thereafter, Defendant Physicians Preferred, through its agent Dawn, in furtherance of the foregoing agreement and conspiracy, prepared and forwarded in excess of 100 Forms 485 to Defendant Suburban Home Physicians for backdating and physician signatures. There was no "face-to-face encounter" as required by Medicare between patient and any medical professional.

33.     Defendant Suburban Home Physicians, at Defendant Jocelyn's direction, affixed a physician signature to every backdated Form 485 provided by Defendant Physicians Preferred and faxed those falsified forms back to Defendant Physicians Preferred including the Form 485 for patient VG.

34.     Defendant Physicians Preferred, when it submitted its claims for patient VG and others to Medicare, knowingly presented a false or fraudulent claim for payment or approval in violation of 31 USC §3729(a)(1)(A) by certifying that, as a condition of payment, the Form 485 for patient VG and others was on file when it was not. Medicare, on information and belief, paid Defendant Physicians Preferred for the foregoing falsified claims.

35.     Defendants Jocelyn and Defendant Suburban Home Physicians violated 31 USC §3729(a)(1)(B) by executing, or causing to be executed, a falsified Form 485 for patient VG and

others, and, in so doing, knowingly made and caused to be made a false record or statement material to the false or fraudulent claim submitted by Defendant Physicians Preferred for services allegedly provided to patient VG and others.

36. Defendants Physicians Preferred, Jocelyn, and Suburban Home Physicians violated 31 USC §3729(a)(1)(C) by conspiring to commit violations of 31 USC §3729(a)(1)(A),(B).

**WHEREFORE** Relators pray:

(A) The subject Defendants pay an amount to the United States Government of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 plus a civil penalty equal to 3 times the amount of damages which the United states has sustained as a result of Defendants' conduct.

(B) Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d);

(C) Relators be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. §3730(d);

(D) The United States and Relators be granted all such other relief as the Court deems just and proper.

## COUNT III
## DEFENDANT SUBURBAN HOME PHYSICIANS' UPCODING AND SUBMITTING CLAIMS FOR SERVICES NEVER PERFORMED

37-47. Relators incorporate paragraphs 1-11 supra as paragraphs 37-47 of Count III.

## PATIENT VN

48. On August 7, 2013, Defendant Suburban Home Physicians allegedly performed an "ultrasound scanning of head and neck blood flow (outside the brain)" on patient VN. According to Medicare records, that procedure was ordered by Albert Young P.A. as an

agent/employee of Defendant Suburban Home Physicians. However, Albert Young P.A. did not order that ultrasound scan because it was not medically necessary.

49.    Defendant Suburban Home Physicians thereafter presented a claim for payment to Medicare using Medicare billing code CPT 93880 (performing bilateral ultrasound). Defendant Suburban Home Physicians, in submitting that claim to Medicare, *via* CMS Form 1500 (Exhibit 7) or its electronic analog, falsely certified that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision…". Medicare paid Defendant Suburban Home Physicians $129.56 for the foregoing false claim.

50.    Also on August 7, 2013, Defendant Suburban Home Physicians allegedly performed a second scan, an "ultrasound limited scanning of head and neck blood flow (inside the brain),"on patient VN. According to Medicare records, that procedure was ordered by Albert Young P.A. as an agent of Defendant Suburban Home Physicians. However, Albert Young P.A. did not order that ultrasound scan because it was also not medically necessary.

51.    Defendant Suburban Home Physicians thereafter presented a claim for payment to Medicare, using the Medicare billing code CPT 93888 (ultrasound limited scanning of head and neck). Defendant Suburban Home Physicians, in submitting that claim to Medicare falsely certified that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision…". Medicare paid Defendant Suburban Home Physicians $67.36 for the foregoing false claim.

52. On September 26, 2013, according to Medicare records, Albert Young P.A. allegedly reviewed the status of patient VN. Defendant Suburban Home Physicians, using Medicare billing code CPT G0181 (supervision of patients under care of home health agencies), falsely presented a claim for payment to Medicare for Albert Young P.A.'s alleged supervision of patient VN. Defendant Suburban Home Physicians, in submitting that claim falsely certified that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision…".

53. Albert Young, P.A. did not supervise the home-health services provided to patient VN on September 26, 2013. His last day of work for Defendant Suburban Home Physicians, as an employee or in any other capacity, was September 6, 2013. Nevertheless, Medicare paid Defendant Suburban Home Physicians $75.61 for services that Albert Young, P.A. never performed.

54. Defendant Suburban Home Physicians violated 31 USC §3729(a)(1)(A) by presenting, or causing to be presented, false or fraudulent claims for payment or approval to Medicare for two August 7, 2013 ultrasounds, allegedly performed on patient VN, which were not medically necessary and which were not ordered by the professional indicated.

55. Defendant Suburban Home Physicians violated 31 USC §3729(a)(1)(A) by presenting, or causing to be presented, a false or fraudulent claim for payment or approval to Medicare for a September 26, 2013 supervision of patient VN's medical status by Albert Young P.A. that never took place.

**PATIENT SM**

14

56.     August 15, 2013, Albert Young P.A. as an employee of Defendant Suburban Home Physicians, visited the home of patient SM. As a result of that visit, Defendant Suburban Home Physicians presented a claim for payment to Medicare using billing code CPT 99350-25 ("Established patient home visit, typically 60 minutes"—the highest level of complexity) for that visit. Medicare paid Defendant Suburban Home Physicians $125.09 for that visit. That visit lasted less than 30 minutes and was not complex.

57.     Defendant Suburban Home Physicians violated 31 USC §3729(a)(1)(A) by presenting, or causing to be presented, a false or fraudulent claim for payment or approval to Medicare for a 60-minute home visit to patient SM which did not exceed 30 minutes.

**WHEREFORE** Relators pray:

(A)     Defendant Suburban Home Physicians pay an amount to the United States Government of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 plus a civil penalty equal to 3 times the amount of damages which the United States has sustained as a result of its foregoing conduct.

(B)     Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d);

(C)     Relators be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. §3730(d);

(D)     The United States and Relators be granted all such other relief as the Court deems just and proper.

## COUNT IV
## PATIENT REFERRALS IN VIOLATION OF THE FEDERAL ANTI-KICKBACK STATUTE (AKS)

58-67. Relators incorporate paragraphs 1-11 *supra* as paragraphs 58-67 of Count IV.

68.     Defendant Suburban Home Physicians and all of the Home Health Defendants depend upon each other. For both, executed Forms 485 are essential to their financial viability.

Absent those executed Forms 485, the Home Health Defendants cannot bill Medicare for the services they provide. Accordingly the Home health Defendants require medical professionals, such as those employed by Defendant Suburban Home Physicians, to execute and return those Forms 485. Defendant Suburban Home Physicians makes money with respect to those Forms 485 as well. As a prerequisite to executing those Forms 485, Defendant Suburban Home Physicians' medical professionals must perform a face-to-face examination on the alleged homebound patient. Defendant Suburban Home Physicians then bills Medicare not only for performing that face-to-face examination but for the subsequent supervision of Home Health Services every 30 days. Accordingly, the Home Health Defendants and Defendant Suburban Home Physicians cross-refer patients--the currency of their relationship—with understanding that every patient will be referred back for the services Medicare will pay them for.

## REFERRALS FROM DEFENANT SUBURBAN HOME PHYSICIANS TO HOME HEALTH AGENCIES

69. NF is, and at all times relevant was, an employee of Defendant Suburban Home Physicians. His LinkedIn posting reflects that he is both the "Doctor Liaison at Doctor At Home" and the "Treasurer at Northwest Suburban Senior Coalition." His job includes "marketing" Defendant Suburban Home Physicians' services. "Marketing" means finding or creating homebound patients for subsequent referral to Home health Agencies.

70. NF, according to his representations to then-co-employees, "markets" Defendant Suburban Home Physicians services to seniors at churches, at senior events, and at the Northwest Suburban Senior Coalition. He claims to have offered cash and gift cards to induce seniors to enroll in Medicare as homebound patients. Some of those allegedly homebound patients, when

visited by medical professionals for the examinations required by Medicare, have demanded cash (*e.g.* patient GL) or scheduled drugs (*e.g.* patients DH, CM, and GK) before opening their doors.

71.     Relators' limited access to Defendant Suburban Home Physicians' records (a small sampling) reflects that Defendant Suburban Home Physicians has made the following patient referrals:

A.     To Defendant Medex, 16 patients: DA, MB, RB BC, DC, PD, BD, WK, MM, SM, BM, PR. ES, AT, EW, and FW from May 2, 2012 to January 26, 2013,

B.     To Defendant Comet/Miranda, 19 patients: RG, JR, AR, ER, DT, EB, MC, RD, DH, JM, RM, MM, MM, RM, MR, MS, ET, VT, and EV from October 26, 2011 to December 22, 2012.

C.     To Defendant Home Life, 4 patients: JH, BJ, MK, and GS from April 13, 2012 to July 30 2013,

D.     To Defendant Bestmed/Adonis, 13 patients: DB, WB, BC, BC, CJ, NJ, CO, BP, ER, GS, FS, BS and EE from April 17, 2012 to July 30, 2013.

E.     To Defendant A & Z, 5 patients: GH, RH, ES, BP, and ED all on July 13, 2013

F.     To Defendant Govvas: on June 7, 2013 patients DR and AC; on July 30, 2013 patients JH, BJ, and ET; and on August 6, 2013 patient KW.

G.     On July 30, 2013: Defendant Suburban Home Physicians referred 38 patients to various Home Health Agencies.

H.     On December 3, 2011, Defendant Suburban Home Physicians had an "intake" of 116 patients essentially every one of which was referred to Home Health Agencies.

## REFERRALS FROM HOME HEALTH AGENCY DEFENDANTS TO DEFENDANT SUBURBAN HOME PHYSICIANS

72.     Home Health Agencies have their own methods of acquiring patients. Relators' limited access to Defendant Suburban Home Physicians' records (a small sampling) reflects that

17

the following patients were referred from the indicated Home Health Agencies to Defendant Suburban Home Physicians:

        A.      Defendant Bestmed/Adonis, 8 patients: JB, EF, PG, MJ, RR, RR, OS, and RW from December 3, 2011 to April 5, 2012.

        B.      Defendant Comet/Miranda: patients RK and KL on April 13, 2012 and December 9, 2012 respectively.

        C.      Defendant Pro Vita, 11 patients: TC, BC, MG, PG, RH, BI, MJ, SM, MO, GP, LR, and IW all on December 3, 2011.

73.    The term remuneration, in the AKS, 42 U.S.C.A. §1320a-7b(b)(1)(A); (2)(A), means anything of value including the opportunity to earn revenue.

74.    An executed Medicare Form 485 constitutes remuneration as defined in the AKS, 42 U.S.C.A. §1320a-7b(b)(1)(A); (2)(A) in that it has substantial value for both medical providers and Home Health Agencies. An executed Form 485 enables both Defendant Suburban Home Physicians and the Home Health Defendants to provide services and receive revenue going forward. Further, Defendant Suburban Home Physicians, by executing a Form 485 supplied by a Home health Agency, constitutes a patient referral to that Home health Agency as a matter of law.

75.    Patients also have a value. Absent patients, neither Home Health Agencies nor medical professionals earn revenue.

76.    In violation of 42 U.S.C.A. §1320a-7b(b)(1)(A), Defendant Suburban Home Physicians and the Home Health Defendants knowingly and willfully solicited or received both Forms 485 and patients from each other as remuneration in return for referring patients to each other for the subsequent furnishing of Home Health services paid for by Medicare. The foregoing violations of the AKS are false claims pursuant to 42 U.S.C. §1320a-7b(g).

77.     In violation of 42 U.S.C.A. §1320a-7b(b)(2)(A), Defendant Suburban Home Physicians and the Home Health Defendants knowingly and willfully offered or paid remuneration, in the form of patient referrals to each other, to induce the return referral of those patients for the furnishing of Home Health services paid for by Medicare.

**WHEREFORE** Relators pray:

(A)     The Defendant Suburban Home Physicians and the Home Health Defendants pay an amount to the United States Government of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 plus a civil penalty equal to 3 times the amount of damages which the United States has sustained as a result of its foregoing conduct.

(B)     Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d);

(C)     Relators be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. §3730(d);

(D)     The United States and Relators be granted all such other relief as the Court deems just and proper.

### COUNT V
### THE GENESIS OF AND THE ILLEGAL BILLING ON
### BEHALF OF DEFENDANT SUBURBAN HOME PHYSICIANS

78-88.  Plaintiff incorporates paragraphs 1-11 *supra* as paragraphs 78-88 of Count V.

89.     On February 17, 2009, Ritesh Patel, M.D. and Anand Satyadev M.D. (*a/k/a* Anand Thakkar M.D.), physicians licensed to practice medicine in Illinois, formed and became the only two members of Defendant Suburban Home Physicians LLC. Drs. Patel and Satyadev thereafter submitted an application (Medicare Form 855B) on behalf of Defendant Suburban Home Physicians to enroll as a Medicare Provider. In that application, Defendant Suburban Home Physicians listed and correctly certified that their Illinois medical license numbers were 036115260 and 036112261 respectively.

19

90.     On or about February 19, 2009, Medicare issued NPI 1770722407 to Defendant Suburban Home Physicians. In so doing, Medicare classified Defendant Suburban Home Physicians' practice as Medicare "taxonomy193400000X *Single Specialty*-Group/Groups of Doctors" ("a business group of one or more individual practitioners, all of who practice with the same area of specialization"). That specialization was internal medicine.

91.     On or about November 9, 2009, Defendant Jerry, in a contract incorrectly styled as an asset-purchase agreement, purchased the entire membership interests of Drs. Patel and Satyadev in Defendant Suburban Home Physicians.

92.     On December 4, 2009, Drs. Patel and Satyadev, according to the records of the Illinois Secretary of State, terminated their relationship with Defendant Suburban Home Physicians. However, Defendants Jerry, Prashant, Naimish, Jocelyn and Suburban Home Physicians never removed the Illinois medical license numbers of Drs. Patel and Satyadev from the NPI Registry.

93.     On and after December 4, 2009, Defendant Jerry was Defendant Suburban Home Physicians' sole member/manager of record. Defendant Jerry has never been licensed to practice medicine in Illinois. The *de facto* owners of Defendant Suburban Home Physicians, Defendants Naimish and Prashant, have never been licensed to practice medicine in Illinois. Defendant Jocelyn has never been licensed to practice medicine in Illinois.

94.     Pursuant to 805 ILCS 180/1-25(4), an LLC can only practice medicine in Illinois if all of its managers and members are "licensed to practice medicine under the Medical Practice Act of 1987." Yet, Defendants Jerry, Prashant, Naimish, Jocelyn and Suburban Home Physicians practiced, and continue to practice, medicine in violation of Illinois Law.

95.     From December 4, 2009 to the present, Defendants Jerry, Prashant, Naimish, Jocelyn, and Suburban Home Physicians:

    A.      Agreed to hire, and hired physicians; physician assistants; and nurse practitioners as employees of Defendant Suburban Home Physicians to treat homebound patients.

    B.      Agreed to submit, and submitted claims on behalf of Defendant Suburban Home Physicians to Medicare under color of the same medical license numbers and the same Medicare NPI number originally obtained Drs. Patel and Satyadev.

    C.      Continued to improperly use and list the medical license numbers of Drs. Patel and Satyadev as those of Defendant Suburban Home Physicians in the National Plan & Provider Enumeration System and the NPI Registry even though those physicians had no connection with Defendant Suburban Home Physicians.

    D.      Received payment from Medicare for medical services performed by Defendant Suburban Home Physicians.

96.     42 C.F.R. §424.500 requires medical providers, including Defendant Suburban Home Physicians, as an absolute precondition to receiving Medicare payments, to "meet and maintain these enrollment requirements" of the Medicare Programs including those requirements set forth in 42 C.F.R. §424.520(a)(2).

97.     42 C.F.R. §424.516(a)(2) required Defendant Suburban Home Physicians to be licensed under Illinois Law *viz* "[c]ompliance with Federal and State licensure, certification, and regulatory requirements, as required based on the type of services or supplies the provider or supplier type will furnish and bill Medicare."

98.     On and after December 4, 2009, Defendants Jerry, Prashant, Naimish, Jocelyn, and Defendant Suburban Home Physicians, agreed to present, and knowingly presented false or fraudulent claims for payment or approval to Medicare, or a Medicare agent, in violation of 31

USC §3729(a)(1)(A) and received payment from Medicare for those claims. Every one of those claims was false because:

> A, Defendants Jerry, Prashant, Naimish, Jocelyn, and Defendant Suburban Home Physicians were never licensed to practice medicine in Illinois.

> B. Defendants Jerry, Prashant, Naimish, Jocelyn, and Defendant Suburban Home Physicians never met the licensure requirement set forth in 42 C.F.R. §424.516(a)(2) which was a precondition to receiving Medicare payments pursuant to 42 C.F.R. §424.500.

99. Defendants Jerry, Prashant, Naimish, Jocelyn, and Defendant Suburban Home Physicians violated 31 USC §3729(a)(1)(C) by conspiring to commit violations of 31 USC §3729(a)(1)(A).

100. Defendant Jerry displayed his knowing and willful contempt of the law on multiple occasions by telling one or more then-employees of Defendant Suburban Home Physicians that he did not care whether he submitted false claims to Medicare; that he had money stashed in the Philippines; and that he renews a plane ticket to the Philippines every Friday.

**WHEREFORE** Relators pray:

(A) Defendants Suburban Home Physicians, Defendant Jerry, Defendant Jocelyn, Defendant Naimish, and Defendant Prashant pay an amount to the United States Government of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 plus a civil penalty equal to 3 times the amount of damages which the United States has sustained as a result of its foregoing conduct.

(B) Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d);

(C) Relators be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. §3730(d);

22

(D)     The United States and Relators be granted all such other relief as the Court
deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a

trial by jury.

Respectfully Submitted,

Robert Orman

Law Office of Robert Orman
Robert Orman
Matthew T. Malinowski
One North LaSalle Street
Suite 1775
Chicago, IL 60602
(312) 372-0515
Email:  Roblaw@aol.com
Email:  matt@mattmalinowski.com
Attorney Number 312-1965

Crains January 15, 2014

(AP) — For the first time in history, federal health officials said Friday they will ban certain types of Medicare and Medicaid providers in three high-fraud cities from enrolling in the taxpayer-funded programs for the poor as part of an effort to prevent scams.

The strict moratoriums, which start Tuesday, give federal health officials unprecedented power to choose any region and industry with high fraud activity and ban new Medicare and Medicaid providers from joining the programs for six months. They wouldn't ban existing providers.

The administrator of the Centers for Medicare and Medicaid Services said the agency is targeting providers of home health care in eight counties in the Miami and Chicago areas. All ambulance providers would be banned in eight counties in the Houston area.

**(Related story: Caught in the dragnet: Feds clamp down on Medicare abuse)**

"We fully support the action taken," said Val J. Halamandaris, president, National Association for Home Care & Hospice.

"NAHC has long supported program integrity measures such as this and strongly recommended that Congress give CMS the authority to issue a moratorium as part of the Affordable Care Act. We look forward to continue working with CMS as it considers other areas of the country where a moratorium may be needed," Halamandaris said.

The moratorium, which was first reported by The Associated Press, will also extend to Children's Health Insurance Program providers in the same areas, agency administrator Marilyn Tavenner said in a statement. It's unclear how many providers will be shut out of the programs.

There were 662 home health agencies in Miami-Dade in 2012 and the ratio of home health agencies to Medicare beneficiaries was 1,960 percent greater in Miami Dade County than other counties, according to figures from federal health officials.

South Florida, long known as ground-zero for Medicare fraud, has also had several high profile prosecutions involving that industry.

In February, the owners and operators of two Miami home health agencies were sentenced for their participation in a $48 million Medicare fraud scheme.

The number of home health providers in Cook County, Ill., increased from 301 to 509 between 2008 and 2012. There were 275 ambulance suppliers in Harris County, Texas, in 2012. The ratio of providers to patients in both regions was also several hundred times greater than in other counties, federal health officials said.

Top Senate Republicans have criticized the agency for not using the powerful moratoriums sooner as a tool to combat an estimated $60 billion a year in Medicare fraud. Senators Chuck Grassley, who is the ranking Republican on the Judiciary Committee, and Orrin Hatch, who is the ranking Republican on the Finance Committee, sent a letter to federal health officials in 2011 urging them to use the bans.

"While it's certainly better late than never, it's unfortunate that it took CMS three years to use the tools it's had to protect seniors," Hatch said in a statement Friday, adding he hoped "to see more action like this."

Officials for the Department of Health and Services inspector general lobbied hard to ensure moratorium power was included under the Affordable Care Act as the Obama administration focuses on cleaning up fraud on the front end by preventing crooks from getting into the program in the first place.



EXHIBIT
1
p.1 of 2

"There's no shortage of bad actors to defraud the taxpayers, and the number gets bigger all the time, so it's good to see the administration at last using this new tool to fight fraud," Grassley said in a statement.

In the past, federal health officials tried to stall new provider applications from being processed, hoping to slow the number flocking to high-fraud sectors. But when providers inevitably complained, the agency had to process their paperwork.

The federal agency can also revoke the IDs of suspicious providers, but those are temporary and many companies are able to reenroll later or enroll under a different name.

Federal health officials have been reluctant to use one of its most powerful new tools, worrying moratoriums may harm legitimate providers and hamper patients' access to care. Tavenner said in the statement that would not happen, but the agency didn't elaborate. Agency officials said they intend to consider other moratoriums in different industries in other cities going forward.

The ability to target certain industries and cities is especially helpful as Medicare fraud has morphed into complex schemes over the years, moving from medical equipment and HIV infusion fraud to ambulance scams, as crooks try to stay one step ahead of authorities. Fraudsters have also spread out across the country, bringing their scams to new cities once authorities catch onto them.

The scams have also grown more sophisticated, using recruiters who are paid kickbacks for finding patients, while doctors, nurses and company owners coordinate to appear to deliver medical services that they are not. The moratoriums come as budget cuts are forcing federal health officials to retract its watchdog arm as it launches its largest health care expansion since the Medicare program.

Health and Human Services inspector general officials said they are in the process of cutting 20 percent of its staff, from 1,800 at its peak to 1,400, and cancelling several high profile projects, including an audit that would have investigated technology security in the federal and state health exchanges launching in October. The project was slated to examine issue including whether patient information was secure from hackers on the online marketplace, where individuals and small businesses can shop for health insurance.

**1100**

SPONSORED BY:



| | |
|---|---|
| **From:** | Nurse11 |
| **Sent:** | Monday, July 01, 2013 7:41 PM |
| **To:** | !!CHPH |
| **Cc:** | Jocelyn Gumila |
| **Subject:** | Pharmacy Name |
| | |
| **Importance:** | High |

Good Evening,

Please be informed,

Monakea Pharmacy (630-580-9462) change their name to Value Care Pharmacy Inc. (773-930-3685) Please update patient's chart once you encounter this and inform patient they just change their name but it is still the same.

Please advice

Thank you



Maria Princess T. Estrella, R.N., BSN
Call Team
Doctor At Home
830 E. Higgins Rd. suite 113A
Schaumburg, Illinois 60173
Tel. # (224) 653-9000 Ext. 225
Fax # (224) 653-8459



1

# Medicare Benefit Policy Manual
## Chapter 7 - Home Health Services

**Table of Contents**
*(Rev.139, Issued: 02-16-11)*

10.9 - *Outlier Payments*

10.10 - *Discharge Issues*

10.11 - *Consolidated Billing*

10.12 - *Change of Ownership Relationship to Episodes Under PPS*

30.5.1.1 - *Face-to-Face Encounter*



EXHIBIT
3
P.1 of 6

**C. Change of Ownership - Mergers**

The merger of a provider corporation into another corporation constitutes a change of ownership. For information on specific procedures, refer to *Pub. 100-07*, State Operations Manual, *chapter 2, section 2202.17.*

## 30.2.1 - Content of the Plan of Care
*(Rev. 139, Issued: 02- 16-11, Effective: 01-01-11, Implementation: 03-10-11)*

*The HHA must be acting upon a physician plan of care that meets the requirements of this section for HHA services to be covered.*

The plan of care must contain all pertinent diagnoses, including:

- The patient's mental status;

- The types of services, supplies, and equipment required;

- The frequency of the visits to be made;

- Prognosis;

- Rehabilitation potential;

- Functional limitations;

- Activities permitted;

- Nutritional requirements;

- All medications and treatments;

- Safety measures to protect against injury;

- Instructions for timely discharge or referral; and

- Any additional items the HHA or physician choose to include.

*If the plan of care includes a course of treatment for therapy services:*

- *The course of therapy treatment must be established by the physician after any needed consultation with the qualified therapist;*



- *The plan must include measurable therapy treatment goals which pertain directly to the patient's illness or injury, and the patient's resultant impairments;*

- *The plan must include the expected duration of therapy services; and*

- *The plan must describe a course of treatment which is consistent with the qualified therapist's assessment of the patient's function.*

## 30.5 – Physician Certification
*(Rev. 139, Issued: 02- 16-11, Effective: 01-01-11, Implementation: 03-10-11)*

The HHA must be acting upon a *plan of care as described in §30.2, and a physician certification which* meets the requirement of this section for HHA services to be covered.

## 30.5.1 - Content of the Physician Certification
*(Rev. 139, Issued: 02- 16-11, Effective: 01-01-11, Implementation: 03-10-11)*

The physician must certify that:

1. The home health services are or were needed because the patient is or was confined to the home as defined in §20.1;

2. The patient needs or needed skilled nursing services on an intermittent basis (other than solely venipuncture for the purposes of obtaining a blood sample), or physical therapy, or speech-language pathology services; or continues to need occupational therapy after the need for skilled nursing care, physical therapy, or speech-language pathology services ceased. *Where a patient's sole skilled service need is for skilled oversight of unskilled services (management and evaluation of the care plan as defined in §40.1.2.2), the physician must include a brief narrative describing the clinical justification of this need as part of the certification and recertification, or as a signed addendum to the certification and recertification;*

3. A plan of care has been established and is periodically reviewed by a physician;

4. The services are or were furnished while the patient is or was under the care of a physician;

5. *For episodes with starts of care beginning January 1, 2011 and later, prior to initially certifying the home health patient's eligibility, the certifying physician must document that he or she, or an allowed non-physician practitioner (NPP) had a face-to-face encounter with the patient as described in §30.5.1.1. The encounter and documentation are a condition of payment. The initial certification is incomplete without them.*

## 30.5.1.1 – Face-to-Face Encounter
*(Rev. 139, Issued: 02- 16-11, Effective: 01-01-11, Implementation: 03-10-11)*

1. *The certifying physician must document that he or she or an allowed non-physician practitioner (NPP) had a face-to-face encounter with the patient.*

EXHIBIT 3 p. 3 of 6

*Certain NPPs may perform the face-to-face encounter and inform the certifying physician regarding the clinical findings exhibited by the patient during the encounter. However, the certifying physician must document the encounter and sign the certification. NPPs who are allowed to perform the encounter are:*

- *A nurse practitioner or clinical nurse specialist working in collaboration with the certifying physician in accordance with State law;*

- *A certified nurse-midwife as authorized by State law;*

- *A physician assistant under the supervision of the certifying physician*

*NPPs performing the encounter are subject to the same financial restrictions with the HHA as the certifying physician, as described in 42CFR 424.22(d).*

2. *Encounter Documentation Requirements:*

   - *The documentation must include the date when the physician or allowed NPP saw the patient, and a brief narrative composed by the certifying physician who describes how the patient's clinical condition as seen during that encounter supports the patient's homebound status and need for skilled services.*

   - *The certifying physician must document the encounter either on the certification, which the physician signs and dates, or a signed addendum to the certification. It may be written or typed.*

   - *It is acceptable for the certifying physician to dictate the documentation content to one of the physician's support personnel to type. It is also acceptable for the documentation to be generated from a physician's electronic health record.*

   - *It is unacceptable for the physician to verbally communicate the encounter to the HHA, where the HHA would then document the encounter as part of the certification for the physician to sign.*

3. *Timeframe Requirements:*

   - *The encounter must occur no more than 90 days prior to the home health start of care date or within 30 days after the start of care.*

   - *In situations when a physician orders home health care for the patient based on a new condition that was not evident during a visit within the 90 days prior to start of care, the certifying physician or an allowed NPP must see the patient again within 30 days after admission. Specifically, if a patient saw the certifying physician or NPP within the 90 days prior to start of care, another encounter would be needed if the patient's condition had changed to the extent that standards of practice would indicate that the physician or*



EXHIBIT
3
p. 4 of 6

*a non-physician practitioner should examine the patient in order to establish an effective treatment plan.*

4. *Exceptional Circumstances:*

*When a home health patient dies shortly after admission, before the face-to-face encounter occurs, if the contractor determines a good faith effort existed on the part of the HHA to facilitate/coordinate the encounter and if all other certification requirements are met, the certification is deemed to be complete.*

5. *If the below conditions are met, an encounter between the home health patient and the attending physician who cared for the patient during an acute/post acute stay can satisfy the face-to-face encounter requirement.*

- *A physician who attended to the patient in an acute or post-acute setting, but does not follow the patient in the community (such as a hospitalist) may certify the need for home health care based on his/her contact with the patient, and establish and sign the plan of care. The acute/post-acute physician would then transfer/hand off the patient's care to a designated community-based physician who assumes care for the patient.*

*Or,*

- *A physician who attended to the patient in an acute or post-acute setting may certify the need for home health care based on his/her contact with the patient, initiate the orders for home health services, and transfer the patient to a designated community-based physician to review and sign off on the plan of care.*

6. *Telehealth*

*The face-to-face encounter can be performed via a telehealth service, in an approved originating site. An originating site is considered to be the location of an eligible Medicare beneficiary at the time the service being furnished via a telecommunications system occurs. Medicare beneficiaries are eligible for telehealth services only if they are presented from an originating site located in a rural health professional shortage area or in a county outside of a Metropolitan Statistical Area.*

*Entities that participate in a Federal telemedicine demonstration project approved by (or receiving funding from) the Secretary of the Department of Health and Human Services as of December 31, 2000, qualify as originating sites regardless of geographic location.*

*The originating sites authorized by law are:*

- *The office of a physician or practitioner;*
- *Hospitals;*
- *Critical Access Hospitals (CAH);*
- *Rural Health Clinics (RHC);*



- *Federally Qualified Health Centers (FQHC);*
- *Hospital-based or CAH-based Renal Dialysis Centers (including satellites);*
- *Skilled Nursing Facilities (SNF); and*
- *Community Mental Health Centers (CMHC).*

## 30.5.2 – Periodic Recertification
*(Rev. 139, Issued: 02- 16-11, Effective: 01-01-11, Implementation: 03-10-11)*

At the end of the 60-day episode, a decision must be made whether or not to recertify the patient for a subsequent 60-day episode. An eligible beneficiary who qualifies for a subsequent 60-day episode would start the subsequent 60-day episode on day 61. Under HH PPS, the plan of care must be reviewed and signed by the physician every 60 days unless one of the following occurs:

- A beneficiary transfers to another HHA;

- A discharge and return to the same HHA during the 60-day episode.

Medicare does not limit the number of continuous episode recertifications for beneficiaries who continue to be eligible for the home health benefit. The physician certification may cover a period less than but not greater than 60 days.

See §10.4 for counting initial and subsequent 60-day episodes and recertifications. See §10.5 for recertifications for split percentage payments.


EXHIBIT
3
p.6 of 6

*Jocelyn Gumila R.N., B.S.N., WCC*
*Doctor At Home*
*830 E. Higgins Rd., Suite 113A*
*Schaumburg, IL. 60173*
*T-(224) 653-9000; F-(224) 653-8459*

**From:** Vianka Calderon
**Sent:** Thursday, June 13, 2013 4:57 PM
**To:** Jocelyn Gumila
**Cc:** Judi Gumila; Santina Colella
**Subject:** Smith, Elias 485

Patient has not been seen since 01/29/13. Can we sign this 485?
We only saw the patient twice. 01/15/13 initial visit with AY and 01/29/13 sick visit again with AY.



| Department of Health and Human Services Centers for Medicare & Medicaid Services | | | Form Approved OMB No. |
|---|---|---|---|
| **HOME HEALTH CERTIFICATION AND PLAN OF CARE** | | | |
| 1. Patient's HI Claim No. | 2. Start Of Care Date 01/14/2013 | 3. Certification Period From: 05/14/2013 To: 07/12/2013 | 4. Medical Record No. | 5. Provider N 146013 |
| 6. Patient's Name and Address | | 7. Provider's Name, Address and Telephone Number Medex Home Healthcare, Inc 8134 S COTTAGE GROVE AVE Chicago, IL 60619 Phone: (773) 488-1400 | Fax: (877) 828-9722 Email: medexhomecare@att.net | |
| 8. Date of Birth | 9. Sex ☒M ☐F | 10. Medications: | |
| 11. ICD-9-CM | Principal Diagnosis | Date | | |

Vianka Calderon EMT
485 Department Coordinator
Doctor At Home
830 E. Higgins Rd., Suite 113A
Schaumburg IL 60173
Phone: (224) 653-9000 Ext. 212
Fax: (224) 653-8459

2



**From:** Jocelyn Gumila
**Sent:** Thursday, June 13, 2013 2:17 PM
**To:** !!CHPH
**Subject:** RE: 90/30 days rule

In cases , that we have not seen the patient and hh is asking us to sign the 485
But the patient has not been seen and or does not meet the 90/30 day rule- EMAIL ME with those cases

At times, we make exception and sign the 485
But we need to reiterate to the hh agency that we will not be able to give them the F2F for we didn't have any visits
So – you can ask the hh agency to assist us scheduling the patient and assist us so we can see the patient for a visit

*Jocelyn Gumila R.N.,BSN, WCC*
*Doctor At Home*
*830 E. Higgins Rd. Suite113A*
*Schaumburg, IL. 60173*



APPROVED OMB NO. 0938-0279

ST11843 1PLY UB-92

1

| 2 | | 3 PATIENT CONTROL NO. | | 4 TYPE OF BILL |
| --- | --- | --- | --- | --- |
| 5 FED. TAX NO. | 6 STATEMENT COVERS PERIOD FROM / THROUGH | 7 COV D. | 8 N-C D. | 9 C-I D. | 10 L-R D. | 11 |

12 PATIENT NAME     13 PATIENT ADDRESS

| 14 BIRTHDATE | 15 SEX | 16 MS | ADMISSION 17 DATE 18 HR 19 TYPE 20 SRC | 21 D HR | 22 STAT | 23 MEDICAL RECORD NO. | CONDITION CODES 24 25 26 27 28 29 30 | 31 |

| 32 OCCURRENCE CODE DATE | 33 OCCURRENCE CODE DATE | 34 OCCURRENCE CODE DATE | 35 OCCURRENCE CODE DATE | 36 OCCURRENCE SPAN CODE FROM THROUGH | 37 A B C |

a
b
38

| 39 CODE VALUE CODES AMOUNT | 40 CODE VALUE CODES AMOUNT | 41 CODE VALUE CODES AMOUNT |
a
b
c
d

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |
| 15 | | | | | | | |
| 16 | | | | | | | |
| 17 | | | | | | | |
| 18 | | | | | | | |
| 19 | | | | | | | |
| 20 | | | | | | | |
| 21 | | | | | | | |
| 22 | | | | | | | |
| 23 | | | | | | | |

| 50 PAYER | 51 PROVIDER NO. | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 |
| --- | --- | --- | --- | --- | --- | --- |
| A | | | | | | |
| B | | | | | | |
| C | | | | | | |

57     **DUE FROM PATIENT ▶**

| 58 INSURED'S NAME | 59 P. REL | 60 CERT. - SSN - HIC. - ID NO. | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
| --- | --- | --- | --- | --- |
| A | | | | |
| B | | | | |
| C | | | | |

| 63 TREATMENT AUTHORIZATION CODES | 64 ESC | 65 EMPLOYER NAME | 66 EMPLOYER LOCATION |
| --- | --- | --- | --- |
| A | | | |
| B | | | |
| C | | | |

| 67 PRIN. DIAG. CD. | 68 CODE | 69 CODE | OTHER DIAG CODES 70 CODE 71 CODE 72 CODE 73 CODE 74 CODE 75 CODE | 76 ADM. DIAG. CD. | 77 E-CODE | 78 |

| 79 P.C. | 80 | PRINCIPAL PROCEDURE CODE DATE | 81 | OTHER PROCEDURE CODE DATE A | OTHER PROCEDURE CODE DATE B | 82 ATTENDING PHYS. ID |
| | | OTHER PROCEDURE CODE DATE C | | OTHER PROCEDURE CODE DATE D | OTHER PROCEDURE CODE DATE E | 83 OTHER PHYS. ID A |
| | | | | | | OTHER PHYS. ID B |

a
b
c
d
84 REMARKS

85 PROVIDER REPRESENTATIVE
X

EXHIBIT 6 P1 OF 2

UB-92 HCFA-1450     OCR/ORIGINAL     I CERTIFY THE CERTIFICATIONS ON THE REVE

**UNIFORM BILL:**     **NOTICE: ANYONE WHO MISREPRESENTS OR FALSIFIES ESSENTIAL INFORMATION REQUESTED BY THIS FORM MAY UPON CONVICTION BE SUBJECT TO FINE AND IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW.**

Certifications relevant to the Bill and Information Shown on the Face Hereof: Signatures on the face hereof incorporate the following certifications or verifications where pertinent to this Bill:

1. If third party benefits are indicated as being assigned or in participation status, on the face thereof, appropriate assignments by the insured/beneficiary and signature of patient or parent or legal guardian covering authorization to release information are on file. Determinations as to the release of medical and financial information should be guided by the particular terms of the release forms that were executed by the patient or the patient's legal representative. The hospital agrees to save harmless, indemnify and defend any insurer who makes payment in reliance upon this certification, from and against any claim to the insurance proceeds when in fact no valid assignment of benefits to the hospital was made.

2. If patient occupied a private room or required private nursing for medical necessity, any required certifications are on file.

3. Physician's certifications and re-certifications, if required by contract or Federal regulations, are on file.

4. For Christian Science Sanitoriums, verifications and if necessary re-verifications of the patient's need for sanitorium services are on file.

5. Signature of patient or his/her representative on certifications, authorization to release information, and payment request, as required be Federal law and regulations (42 USC 1935f, 42 CFR 424.36, 10 USC 1071 thru 1086, 32 CFR 199) and, any other applicable contract regulations, is on file.

6. This claim, to the best of my knowledge, is correct and complete and is in conformance with the Civil Rights Act of 1964 as amended. Records adequately disclosing services will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law.

7. For Medicare purposes:

    If the patient has indicated that other health insurance or a state medical assistance agency will pay part of his/her medical expenses and he/she wants information about his/her claim released to them upon their request, necessary authorization is on file. The patient's signature on the provider's request to bill Medicare authorizes any holder of medical and non-medical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, workers' compensation, or other insurance which is responsible to pay for the services for which this Medicare claim is made.

8. For Medicaid purposes:

    This is to certify that the foregoing information is true, accurate, and complete.
    I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State Laws.

9. For CHAMPUS purposes:

    This is to certify that:

    (a) the information submitted as part of this claim is true, accurate and complete, and, the services shown on this form were medically indicated and necessary for the health of the patient;

    (b) the patient has represented that by a reported residential address outside a military treatment center catchment area he or she does not live within a catchment area of a U.S. military or U.S. Public Health Service medical facility, or if the patient resides within a catchment area of such a facility, a copy of a Non-Availability Statement (DD Form 1251) is on file, or the physician has certified to a medical emergency in any assistance where a copy of a Non-Availability Statement is not on file;

    (c) the patient or the patient's parent or guardian has responded directly to the provider's request to identify all health insurance coverages, and that all such coverages are identified on the face the claim except those that are exclusively supplemental payments to CHAMPUS-determined benefits;

    (d) the amount billed to CHAMPUS has been billed after all such coverages have been billed and paid, excluding Medicaid, and the amount billed to CHAMPUS is that remaining claimed against CHAMPUS benefits;

    (e) the beneficiary's cost share has not been waived by consent or failure to exercise generally accepted billing and collection efforts; and,

    (f) any hospital-based physician under contract, the cost of whose services are allocated in the charges included in this bill, is not an employee or member of the Uniformed Services. For purposes of this certification, an employee of the Uniformed Services is an employee, appointed in civil service (refer to 5 USC 2105), including part-time or intermittent but excluding contract surgeons or other personnel employed by the Uniformed Services through personal service contracts. Similarly, member of the Uniformed Services does not apply to reserve members of the Uniformed Services not on active duty.

    (g) based on the Consolidated Omnibus Budget Reconciliation Act of 1986, all providers participating in Medicare must also participate in CHAMPUS for inpatient hospital services provided pursuant to admissions to hospitals occurring on or after January 1, 1987.

    (h) if CHAMPUS benefits are to be paid in a participating status, I agree to submit this claim to the appropriate CHAMPUS claims processor as a participating provider. I agree to accept the CHAMPUS-determined reasonable charge as the total charge for the medical services or supplies listed on the claim form. I will accept the CHAMPUS-determined reasonable charge even if it is less than the billed amount, and also agree to accept the amount paid by CHAMPUS, combined with the cost-share amount and deductible amount, if any, paid by or on behalf of the patient as full payment for the listed medical services or supplies. I will make no attempt to collect from the patient (or his or her parent or guardian) amounts over the CHAMPUS-determined reasonable charge. CHAMPUS will make any benefits payable directly to me, if I submit this claim as a participating provider.

ESTIMATED CONTRACT BENEFITS



EXHIBIT
6
P-2 of 2